Ronald BRINKMAN, Respondent,

v.

PAGE TRUCKING COMPANY, INC., et al., Relators, Great West Casualty Company, intervenor, Respondent.

No. 48175.

Supreme Court of Minnesota.

Aug. 11, 1978.

Carroll, Cronan, Roth & Austin and Michael C. Tierney and John Doyle, Minneapolis, for relators.

Meyer, Meyer & Pottratz, Melrose, for Brinkman.

Cousineau, McGuire, Shaughnessy & Anderson and John W. Romine, Minneapolis, for Great West Cas.

PER CURIAM.

Page Trucking Company and its compensation insurer seek review of a decision of the Workers' Compensation Court of Appeals awarding compensation to Ronald Brinkman. They challenge the finding that Brinkman, injured while driving his tractor-trailer unit to haul freight for Page under a "trip lease," was Page's employee rather than an independent contractor. Although we are reluctant to reverse a finding of a relationship essential to recovery of compensation, we are compelled to agree with relators' contention that the finding does not have reasonable support in the evidence.

Page, a contract carrier with authority from the Interstate Commerce Commission to move freight throughout the country, usually hauls agricultural products exempt from ICC regulation from Thief River Falls or other places in Minnesota to out-of-state destinations and hauls products subject to such regulation from those points or places near them to Thief River Falls. It owns 10 tractor-trailer units and hires drivers for them. When its employees and equipment are unable to meet the needs of its customers, Page contracts with individual owner-operators like Brinkman to transport freight.

Brinkman hauled cargoes for other trucking firms also, but between August 1975 and April 1976 he worked 80 percent or more of the time for Page although he conceded that he was free to accept or reject the jobs offered him.[1]

Brinkman held no permits from the Interstate Commerce Commission. Generally, when hauling for Page he took products exempt from ICC regulation to out-of-state destinations, for which under the parties' oral understanding he was paid 92 percent of the tariff received by Page when he used

---

1. At one point Brinkman and Gary Page, Page's dispatcher and an owner of the firm, discussed entering into a written permanent lease, under which Brinkman would lease his unit to Page and work exclusively for them, but this never was done. Brinkman asserted that the parties "verbally" had the understanding he would drive for Page whenever Page had work available for him, a claim disputed by Page.

his own equipment and 40 to 45 cents per mile when he hauled a trailer owned by Page. Page did not withhold income taxes or social security from the payments made to him. Brinkman furnished his own licenses, liability insurance, and fuel, and kept his equipment in repair. He filed tax returns as one engaged in an independent business.

As with the employee-drivers of its equipment, Page would make cash advances to Brinkman and advised him of truck stops which would cash Page checks; but he was not required to comply with instructions given to the employee-drivers about daily hours, distances to be covered, and specific routes to follow nor with orders given the Page drivers not to stop at their homes after beginning a trip and not to carry passengers. Like the employee-drivers, Brinkman was expected to telephone Page's dispatcher to report delivery of his cargo. The employee-drivers would then receive instructions about their return trip, and Brinkman would also inquire whether Page could offer him a return load.

Most of the time Gary Page, the company's dispatcher, would have a return load of nonexempt cargo from some town in the area of Brinkman's destination tentatively scheduled when he left the state. If it was definitely arranged when Brinkman called to report delivery, he would go to the shipper's place of business at his own expense. There, in order to be able to transport the nonexempt products, he would "trip lease" his equipment to Page for the return trip and place placards showing Page's name and ICC rights on his truck. For hauls made under a trip lease Brinkman received 90 percent of the tariff. Again, Page did not withhold income taxes or social security from the payments made to him. Between August 1975 and April 1976 the parties entered into several trip leases which appear to have had no other purpose as between them than to enable Brinkman to transport nonexempt products along the routes Page was authorized by the ICC to use. Brinkman always operated his equipment after entering into the trip lease, and there was no evidence that he was required or expected to perform his work differently after entering into a lease than he had done before.

On April 12, 1976, Brinkman, accompanied by Virgil Boecker, left Thief River Falls to deliver an exempt cargo at points in Kansas and Missouri. Gary Page had told Brinkman he would probably be able to return with a nonexempt load of charcoal from Belle, Missouri, and gave him a trip lease form which Page had signed. Upon calling from Kansas City after delivering the outbound freight, Brinkman was told he could transport the charcoal. Boecker and he then went to Belle, where he signed the trip lease.

This instrument, which was not fully completed by the parties, provided that Brinkman as "owner operator" leased his tractor-trailer unit to Page "for use in hauling and transporting such property as Lessee may require" from the shipper at Belle to a consignee at Thief River Falls. The lease did not state explicitly who was to transport the property or to furnish the driver, nor did it state the amount of compensation Brinkman was to receive, although it provided that the lessee would pay him "for the use of said motor vehicle" and also for "the transportation service performed as outlined on the reverse side hereof." It contained an "Hours of Service Certificate" which was never completed but was signed by Brinkman as "(Driver Lessor)."

Among its terms is one providing that "control and responsibility for the operation of the equipment shall be that of the Lessee," language required by a regulation of the Interstate Commerce Commission which mandates that the lease—

> " * * * provide for the exclusive possession, control, and use of the equipment, and for the complete assumption of responsibility in respect thereto, by the lessee for the duration of said contract, lease or other arrangement * * *." 49 CFR 1057.4(c)(4).

The lease also provided that Brinkman as lessor agreed to keep the equipment in good repair, pay costs of its operation, and reim-

burse Page for shortages, loss, or injury to cargo while "in possession of Lessor, his agents or employees" and for any fines resulting from violations of law by such persons. Brinkman further agreed to remove and return to Page all signs and other evidence of its name and ICC certificate numbers upon termination of the lease at Thief River Falls. The lease also provided:

> "5. Lessor further agrees that he will at all times during the existence of this agreement comply with all laws, rules, and regulations of the Interstate Commerce Commission, Department of Transportation, or any other state authority or Administrative Agency having jurisdiction over the operation of motor vehicles, and that he will comply with all applicable laws and regulations with respect to Workmen's Compensation Insurance, assume full responsibility for the payment of all State and Federal Taxes, if any, for unemployment insurance, old age pensions, or other social security or withholding tax laws as to all persons engaged in the performance of this contract * *."

After executing the lease, Brinkman loaded the cargo, and accompanied by Boecker,[2] started for Thief River Falls. The accident occurred a short time later.

In determining on this evidence that Brinkman was an employee at the time of the accident, the court of appeals applied the familiar factors by which the relationship of employer and employee is tested: (1) The right to control the means and manner of performance; (2) the mode of payment; (3) the furnishing of material or tools; (4) the control of the premises where the work is done;[3] and (5) the right of the employer to discharge. *Guhlke v. Roberts Truck Lines*, 268 Minn. 141, 128 N.W.2d 324 (1964); *Tretter v. Dart Transit Co.*, 271 Minn. 131, 135 N.W.2d 484 (1965); *Wangen*

*v. City of Fountain*, Minn., 255 N.W.2d 813 (1977). It determined that Brinkman was an independent contractor during the outbound trip, and our review of the evidence leads us to the same conclusion. The court of appeals further determined that, after the trip lease was executed, an employment relationship existed because Page controlled the means and manner of performance, furnished the material or tools (by having the equipment under lease), and could discharge Brinkman as driver at any time it chose—inferring the existence of these factors from the lease provision stating that "the control and responsibility for the operation of the equipment shall be that of the lessee."

We have, however, refused to hold that such a "control" provision of itself requires a finding that a driver of leased equipment is the employee of the lessee. *Tretter v. Dart Transit Co., supra*; *Gibson v. Moore Motor Freight Lines, Inc.*, 246 Minn. 359, 75 N.W.2d 212 (1956); *Turner v. Schumacher*, 230 Minn. 172, 41 N.W.2d 182 (1950). In *Gibson* we pointed out that there was nothing in the regulation requiring the lease provision which attempts to define the employer-employee relationship for purposes of the Workers' Compensation Act.

In light of the other provisions in the lease, we are also compelled to conclude that the inferences that Page had the right to control the means and manner of performance and had the right to discharge the driver of the leased equipment at will do not have reasonable support in the evidence as a whole. Although the lease here, unlike that in *Tretter*, did not expressly state that Brinkman was to furnish the driver and pay him, the only reasonable inferences to be drawn from the instrument as a whole are that Brinkman was to transport the cargo himself or furnish his own employees to do so.[4] Those inferences follow from the de-

---

**2.** The evidence is in conflict over whether Brinkman sought permission from Page to have a passenger on the return trip. He said he understood that permission was required when the trip lease became effective.

**3.** This factor is inapplicable here. *Iverson v. Independent School Dist. No. 547*, Minn., 257 N.W.2d 572 (1977).

**4.** The distinction made by the court of appeals between this case and *Tretter* on the ground that the lease there expressly required the lessor to furnish and pay the driver is thus unwarranted. We find the *Tretter* case closer factually to this one than the other cases cited herein or *Hansen v. Adent*, 238 Minn. 540, 57 N.W.2d 681 (1953), cited by the court of ap-

scription of Brinkman as "(Driver Lessor)"; from Page's agreement to pay him for "transportation service performed"; from Brinkman's responsibility for "payment of all State and Federal taxes * * * as to all persons engaged in the performance of this contract"; and from his obligations to keep the equipment in good repair and pay the costs of its operation; to comply with laws and regulations of the ICC and other authorities having jurisdiction over operation of motor vehicles; to comply with laws relating to workers' compensation insurance; to reimburse Page for shortages, loss, or injury to cargo "while in possession of Lessor, his agents or employees" and for fines resulting from violations of law by such persons; and to return to Page its signs and ICC permits upon termination of the lease.

The lease as a whole thus does not support the inferences that Page had the right to control the manner and means of performance—the most significant test of the employment relationship—and that it had the right to discharge the driver of the leased equipment at will. There is no other evidence which does so. Nor does the mode of payment, which was equivocal in character, and the fact that technically Page furnished the material or tools after the lease was entered furnish reasonable evidentiary support for the finding that Brinkman was an employee at the time of the accident. We are therefore compelled to conclude that the compensation award based thereon must be reversed.

Reversed.

OTIS, J., took no part in the consideration or decision of this case.

---

peals. In *Hansen*, where a finding that the driver lessor was an employee of the lessee was affirmed, the lease placing exclusive control of the leased tractor in the lessee apparently was not required to comply with ICC regulations because exempt produce was transported. There was evidence also that the lessee gave specific instructions to the driver throughout the trip.

In *Hagberg v. Colonial & Pacific Frigidways, Inc.*, 279 Minn. 396, 157 N.W.2d 33 (1966), another case in which a finding that drivers furnished by the lessor were employees of the lessee was affirmed, the lease provided not only that the leased equipment was to be under the lessee's exclusive control but also that the drivers themselves were to be under its "direct control and supervision." 279 Minn. 404, 157 N.W.2d 39.